## (September 16, 1983)

■ In the Matter of QUEENS FARMS, INC., et al., Appellants, v JOSEPH GERACE, as Commissioner of the Department of Agriculture and Markets of the State of New York, Respondent. — Appeal from a judgment of the Supreme Court of Special Term (Torraca, J.), entered September 1, 1983 in Albany County, which dismissed petitioners' application, in a proceeding pursuant to CPLR article 78, to annul a determination of the Commissioner of Agriculture and Markets. Section 258-b of the Agriculture and Markets Law, which is the subject of this proceeding, established the Milk Producers Security Fund (security fund) "to protect independent milk producers and cooperatives against loss of payment for milk because of defaults by purchasers" (L 1975, ch 526, § 1). In early July, 1983 a complaint was made concerning checks issued to dairy farmers by the Glen & Mohawk Association, Inc. (Glen & Mohawk) which were dishonored by the banks because of insufficient funds. These checks had been issued for milk delivered to Glen & Mohawk in May. No checks were issued by Glen & Mohawk for milk delivered to it during the month of June. Accordingly, pursuant to section 258-b of the Agriculture and Markets Law, claims were filed by independent dairy farmers and dairy farmer co-operatives against the security fund. After conducting a hearing, the Commissioner of Agriculture and Markets issued a determination which, *inter alia,* ordered immediate payment from the security fund of the undisputed claims. Petitioners then commenced this CPLR article 78 proceeding seeking to annul the commissioner's determination. The proceeding was dismissed by Special Term and the instant appeal ensued. Initially, respondent contends that Special Term's dismissal of the proceeding should be affirmed on the ground that petitioners lack standing to seek review of the commissioner's determination. This contention must be rejected. Petitioners consist of (1) licensed milk dealers who are contributors to the security fund and (2) dairy farmer/producers who did not deal with Glen & Mohawk, but who rely on the fund as security in their sales to other dealers. There has been no denial of their assertion that the payments of the claims allowed herein will substantially, if not totally, deplete the fund. We are unable to understand how those

petitioners who are milk producers and thus the intended statutory beneficiaries of the security fund can be held to lack standing to object to the virtual destruction of the fund under the "zone of interest" test for standing formulated in *Matter of Dairylea Coop. v Walkley* (38 NY2d 6, 9). Those petitioners who are dealers/contributors to the fund are given statutory proprietary rights in the fund, including the right to withdraw their pro rata shares of the fund and to assign their interests upon sale of their businesses (Agriculture and Markets Law, § 258-b, subd 4, pars [c], [d]). These property rights in the fund, substantially invaded if not destroyed by the commissioner's determination, would afford such petitioners standing under the older, stricter "legal interest" test, let alone under the more liberal "zone of interest" test (*Matter of Dairylea Coop. v Walkley, supra,* p 9). Finally on this issue, the fact that *statutorily* (see Agriculture and Markets Law, § 258-b) petitioners lack the right to notice or to be heard at the commissioner's hearing, or to challenge his determination, does not negate standing to seek *judicial* review of the commissioner's determination. Precisely the same point was raised to negate such standing in *Dairylea* (*supra*) and was rejected by the Court of Appeals. "While it is clear that Dairylea may not challenge the commissioner on due process grounds * * * nor by specific statutory right since section 258-d [of the Agriculture and Markets Law] refers solely to applicants and licensees * * * we do not believe that petitioner is barred from challenging the commissioner's action. A fundamental tenet of our system of remedies is that when a government agency seeks to act in a manner adversely affecting a party, judicial review of that action may be had" (*Matter of Dairylea Coop. v Walkley, supra,* p 10 [citations omitted]). Accordingly, the merits of the proceeding must be addressed, albeit limited to "whether the agency exceeded its authority or disregarded the statutory standards" (*Matter of Dairylea Coop. v Walkley, supra,* p 12). Petitioners contend that payments should not be made to claimants because (1) Glen & Mohawk was an unlicensed dealer at the time the indebtedness was incurred and (2) there was no adequate inquiry or findings made as to whether the extensions of credit by claimants to Glen & Mohawk constituted a "reasonable exercise of business judgment". In regard to these contentions, section 258-b (subd 5, par [b]) provides that: "No claims against the * * * security fund shall be allowed for: (1) sales of milk to dealers not licensed by the state of New York, (2) sales of milk by a producer to a milk dealer subsequent to its failure to pay * * * where the commissioner finds, after due notice and opportunity of hearing, that such extension of credit, whether direct or indirect, to such milk dealer by the producer did not constitute a reasonable exercise of business judgment." Turning to petitioners' first argument, we find that Glen & Mohawk was a licensed dealer. Subdivision 2 of section 401 of the State Administrative Procedure Act states that: "When a licensee has made timely and sufficient application for the renewal of a license * * * the existing license does not expire until the application has been finally determined by the agency". On February 23, 1983, the Department of Agriculture and Markets received a timely application and payment for the license fee from Glen & Mohawk for the renewal of its dealer's license for the year commencing April 1, 1983. Admittedly, no formal license was issued to Glen & Mohawk. However, as no determination was made to deny Glen & Mohawk's renewal application, section 401 of the State Administrative Procedure Act controls and Glen & Mohawk must be regarded as a licensed dealer (see, also, Agriculture and Markets Law, § 258-c). A review of the record fails to substantiate petitioners' assertion that Glen & Mohawk's license was revoked after a hearing in 1979. We find more substance to petitioners' alternative objection on the merits. The commissioner has allowed claims of producers here in amounts totaling more than $3 million, apart from his allowance of the claims of two co-operatives,

Eastern Milk Producers Cooperative, Inc., and Dairylea Cooperative. As previously quoted, under the statute, the commissioner is precluded from allowing claims arising out of any direct or *indirect* extension of credit constituting an unreasonable exercise of business judgment (Agriculture and Markets Law, § 258-b, subd 5, par [b]). This provision was inserted to prevent depletion of the milk producers security fund through payment of the claims of producers who imprudently extended credit open handedly when they should have sold milk only on a cash basis (*Matter of Eastern Milk Producers Coop. Assn. v State of New York Dept. of Agric. & Markets,* 58 NY2d 1097, 1100-1101). The record is undeniably clear here that, over a period of years, Glen & Mohawk has been a notorious violator of statutory regulations and a chronic defaulter in making timely payment of its debts, including not only producers' claims but also fines levied by the commissioner. Only six months before the default now under consideration, the Department of Agriculture and Markets had to investigate a series of dishonored checks by Glen & Mohawk issued in late December, 1982. And in September, 1982, Glen & Mohawk was reprimanded for failing to make partial payments to producers in the amounts required by law. Except as to the claims of the co-operatives above mentioned, there is absolutely nothing whatsoever in the record pertaining to whether the producer/claimants here improperly extended credit to Glen & Mohawk, directly or indirectly (e.g., by accepting checks later dishonored instead of demanding cash on delivery). The milk accounts examiner for the Department of Agriculture and Markets expressly conceded in his testimony that he had not made any investigation of late payments by Glen & Mohawk to the producer/claimants prior to the May and June defaults. The co-operatives clearly had received late and short payments in the several months prior to the current defaults. And the record before us fails to disclose whether any June 10 check payments were either dishonored or short and, if so, whether the producers improperly failed to require cash on delivery thereafter. The hearing officer explicitly precluded any inquiry at the hearing on imprudent extension of credit. Moreover, again except as to the two co-operatives, the commissioner's determination under review is entirely devoid of any finding on this issue as to other claims. Thus, it seems to us uncontestable that the commissioner has allowed claims worth more than $3 million in total disregard of his statutory duty to make inquiry and to disallow claims which were the result of imprudent extensions of credit. Accordingly, the commissioner's determination should be annulled and the matter remitted for further proceedings not inconsistent herewith. Judgment reversed, on the law and the facts, without costs, and matter remitted to the Commissioner of the Department of Agriculture and Markets for further proceedings not inconsistent herewith. Main, Weiss and Levine, JJ., concur; Mahoney, P. J., dissents and votes to affirm in the following memorandum; Kane, J., dissents and votes to affirm in a separate memorandum.

Mahoney, P. J. (dissenting). I agree with the majority that petitioners have standing to commence this proceeding. On the merits, I agree with the other members of the court that Glen & Mohawk was a licensed dealer. However, I believe that the record demonstrates that a reasonable investigation was made by the commissioner to determine whether the extension of credit to Glen & Mohawk constituted a reasonable exercise of business judgment. Accordingly, I would affirm.

Kane, J. (dissenting). I feel very strongly that these petitioners do not, and should not, have standing to bring this proceeding. I have scrutinized the language of *Matter of Dairylea Coop. v Walkley* (38 NY2d 6), wherein under similar circumstances the question of standing was discussed at length and found to exist for limited purposes. However, it appears that *Dairylea (supra)*

turned on the absence in the statutory scheme of a clear legislative intent to deny review of the commissioner's determination, without a hearing, of an application for the extension of a milk dealer's license to include a larger sales area (Agriculture and Markets Law, § 258-c). There as here, the statute specifically precluded the petitioner from intervening in the underlying agency proceedings. Nevertheless, the court granted a competing milk dealer the right to seek judicial review because the underlying purpose of the particular statute involved was to prevent destructive competition in an area already adequately served. This very purpose was set forth in the title of that statute and the keystone of the court's decision was fully articulated when it said "[t]he determinative factor is the specific incorporation into the statute of the objective of preventing destructive competition (Agriculture and Markets Law, § 258-c)" (*Matter of Dairylea Coop. v Walkley, supra,* p 11). The logic of that reasoning is obvious. Applying that same logic to the matter at hand, the clear expression of legislative intent is again found in the very title of the statutory provision in this proceeding. It begins as follows: "§ 258-b. *Prompt payment for milk purchases;* security funds; bonding of milk dealers" (emphasis added). The section limits standing to institute a proceeding to review the commissioner's determination pursuant to CPLR article 78 to "the defaulting milk dealer or the claimant" and further provides that notices of hearings to consider claims against the security fund are required to be given only to claimants and the defaulting dealer (Agriculture and Markets Law, § 258-b, subd 5, pars [c], [d]). A reading of these provisions compels me to conclude that the expressed intention of the Legislature was to insure that, upon default in payment by a milk dealer to a farmer/producer, funds would be available for the prompt and expeditious payment to the producers, on behalf of the defaulting dealer, from a fund established for that purpose by all dealers throughout the State. It was further intended that such payment was to be made after a hearing and in the considered discretion of the commissioner without hindrance and delay from endless litigation, an evil sought to be avoided and which unfortunately is evidenced, in tragic manner, by this very proceeding. Standing for those petitioners, who are licensed milk dealers, does not arise from the statutory provisions providing dealer contributors to the security fund with the right to withdraw their pro rata contributions upon termination of participation in the fund (Agriculture and Markets Law, § 258-b, subd 4, pars [c], [d]). Any right or privilege granted therein is severely circumscribed by requirements for the substitution of its pro rata share in the fund, after the costs of administration, with a surety bond or other security. I find it difficult to conclude such a provision provides the necessary "legal interest" to permit every dealer throughout the State to intervene and interfere with the clear legislative intent negating review of the commissioner's actions. Additionally, were I to reach the merits, I would agree with that portion of the majority statement which finds that Glen & Mohawk was a licensed dealer, but I could never agree that the farmers can be accused of an unreasonable exercise of business judgment in delivering their milk to Glen & Mohawk on credit. To conclude otherwise is a misunderstanding of the problems that exist throughout the milk industry today and a failure to recognize the historic manner in which farmers have done business for decades. Moreover, there is nothing in the record to indicate that, up to the time of actual default, there was any prior failure to pay *producers* for their produce within reasonable limits or statutory requirements, as the following colloquy demonstrates. "Q. Mr. Murray [Associate Milk Accounts Examiner for the Department of Agriculture and Markets], in the last 12 months, before Glen & Mohawk defaulted in payments, was your office in receipt of any notices of

failure to make prompt payments *from any producers?* A. No." (Emphasis added.) Finally, in light of the above, I fully agree with Special Term's conclusion that the instant record demonstrates that a reasonable investigation was made by the commissioner to determine whether the extension of credit to Glen & Mohawk constituted a reasonable exercise of business judgment. No further hearings are, therefore, necessary. Special Term's judgment dismissing the petition should be affirmed.